UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

JAMES SCOTT,

    Plaintiff,

v.                                                              Case No.

ROMAN CATHOLIC CHURCH
DIOCESE OF GALLUP, and
CATHOLIC CHARITIES OF
GALLUP, INC., dba CATHOLIC
CHARITIES OF FARMINGTON, INC.,

    Defendants.                                          JURY DEMANDED

### COMPLAINT FOR DAMAGES FOR VIOLATION OF THE FAIR HOUSING LAWS AND THE TORT OF WRONGFUL DISCHARGE

Comes now the Plaintiff by and through his attorneys, Pia Gallegos Law Firm, P.C., (Pia Gallegos) and Steven K. Sanders & Associates, LLC, (Steven K. Sanders) and for his complaint states:

### Parties, Jurisdiction, Venue

1. This is an action for declaratory judgment, permanent injunctive relief, and for damages for Defendants' unlawful actions including coercion, intimidation, threats, and interference with Plaintiff's employment because of Plaintiff's aid and encouragement of others in the exercise of their Fair Housing rights. This action arises under the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, as amended, 42 U.S.C. §§ 3601 et seq., [the Fair Housing Act], with pendent state claims for wrongful discharge in violation of the public policy of New Mexico.

2. Defendants' unlawful actions include their attempts to coerce and intimidate Plaintiff to discriminate against individuals of Hispanic or Mexican descent or national origin in violations of the Fair Housing Act.

1

3. When Plaintiff refused to participate in unlawful discrimination, Defendants retaliated against Plaintiff by terminating his employment in violation of public policy.

4. Jurisdiction is conferred on this Court by 42 U.S.C. §3613 and by 28 U.S.C. §§ 1331 and 1343(a)(4). This Court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367.

5. Declaratory relief is authorized by 28 U.S.C. Sections 2201 and 2202.

6. Venue is proper in this District as the cause of action arose in New Mexico.

7. Plaintiff James Scott is a resident of Farmington, San Juan County, New Mexico.

8. Defendant Roman Catholic Church of the Diocese of Gallup is a non profit religious entity providing housing services in the State of New Mexico. Its agent for service of process is Sheehan, Sheehan & Stelzner, PA, 707 Broadway N.E. Ste. 300, Albuquerque, NM 87103.

9. Defendant Catholic Charities of Gallup, Inc. is a non profit corporation formed and incorporated in the State of New Mexico. Its agent for service of process is Rev. Donald E. Pelotte at 711 S. Puerco Drive, Gallup, New Mexico 87305, or his successor. Defendant Catholic Charities of Gallup, Inc. is an agent of Defendant Roman Catholic Diocese of Gallup. Defendant Catholic Charities of Gallup, Inc. does business as and provides services under the names of Catholic Charities of Farmington, Inc., San Juan Catholic Charities, and Good Shepherd Center, among other names.

**Background Facts**

10. On about October 13, 2004, Defendants Roman Catholic Church Diocese of Gallup and Defendant Catholic Charities of Gallup, Inc. doing business as Catholic Charities of

Farmington, Inc., hired Plaintiff Scott as Assistant Director and Immigration Director of Catholic Charities of Farmington.  Plaintiff Scott did his work based in Farmington, New Mexico.

11. As Assistant Director and Immigration Director, Plaintiff Scott had no supervisory authority over any employees, and initially, he had no check-signing authority.

12. As Immigration Director, Plaintiff Scott's duties were to serve the immigration community in providing US Customs Immigration Services ("CIS") services including assisting with citizenship, residency, work permits and legal services on domestic violence matters.

13. As Assistant Director, Plaintiff Scott's duties were to assist in the operation of the homeless drop-in center in the absence of the regular manager of the center, maintain the air conditioner and assist with walk-in clients.

14. In July 2005, Defendants hired Sister Kathleen Driscoll, from North Carolina, as Executive Director of Defendant Catholic Charities of Gallup, Inc. to oversee all of the charitable entities of Defendant Roman Catholic Diocese of Gallup, including those doing business under the names Defendant Catholic Charities of Gallup, Inc., and Catholic Charities of Farmington, Inc.  Sister Kathleen Driscoll managed from her base in Gallup, New Mexico.  Sister Mary Thurlough, from New York State, was made her Assistant at that time and was also based in Gallup, New Mexico.  All actions taken by the Sisters were within the course and scope of their duties with Defendants.

15. When Sister Kathleen Driscoll was hired as Executive Director, Plaintiff Scott met with her and her Assistant Sister Mary Thurlough to discuss urgent problems in Farmington that needed immediate attention.  Among other things, Plaintiff Scott discussed his concerns about waste, theft and abuse of State of New Mexico monies (in the form of "incentive cards," cash cards from local businesses) that were granted to Defendants for charitable purposes.

Plaintiff requested the implementation of security measures such as accountability policies, a safe, better locks on the doors and a roof over the offices.

16. By December 2005, Sister Kathleen had taken no action to address the waste, theft and abuse of State of New Mexico monies, and Plaintiff Scott again went to Sisters Kathleen and Mary to complain of the problem and suggest methods by which to resolve the problems.

17. On about January 3, 2006, Sister Kathleen Driscoll hired Sister Maggie Jackson, from Missouri, as Director of Catholic Charities of Farmington, Inc. Sister Maggie Jackson was the direct supervisor of Plaintiff James Scott and was based in Farmington, New Mexico. Plaintiff Scott's duties as Assistant Director were changed to assisting Sister Maggie in whatever tasks she gave to him. All of Sister Maggie Mackson's actions described herein were within the course and scope of her duties with Defendants.

18. Soon after Sister Maggie Jackson was hired as Director, Plaintiff Scott noticed her extreme incompetence in managing the various programs of Catholic Charities of Farmington, Inc. Sister Maggie was in charge of a Teen Parent Program and a Daddy Program, both programs contracted and funded by the State of New Mexico and governed by laws, regulations and policies of the state, as well as by the grant proposal accepted by the State.

19. From January 2006 through December 2008, when Sister Maggie resigned, Plaintiff repeatedly informed Sisters Kathleen and Mary that Catholic Charities of Gallup, Inc., was not in compliance with state laws, regulations and policies, as well as its approved grant proposals. Specifically, Plaintiff complained of the following:

a. Sister Maggie allowed the waste, theft and abuse of State of New Mexico monies, in the form of "incentive cards," cash cards from local businesses, that were granted to Defendants for charitable purposes;

b. Sister Maggie was allowing teens and/or their children to be left at the Catholic Charities building without supervision, in violation of public policy,

c. Sister Maggie was not allowing Mexicans to stay in the Drexell House, transitional housing, in violation of HUD's Supportive Housing Program Desk Guide and federal and state housing discrimination laws prohibiting discrimination on the basis of national origin;

d. Sister Maggie was not providing herself and other members of the staff the training in sexual abuse detection and awareness required by the Diocese and approved by public policy;

e. Sister Maggie was dispensing medication to street people without a license, in violation of state law, including NMSA 21-1-16;

f. Sister Maggie was endangering children by giving money to meth addicts to manufacture, distribute or buy drugs, endangering the public by giving gas money to people high on drugs, and endangering the public by giving money to meth manufacturers for hotel rooms;

g. Sister Maggie was violating the state contracts for the Teen Parent Services Program and the New Mexico GRADS Dads Program by failing to provide life skills classes in home maintenance, meal planning and preparation, positive parenting, failing to direct the Programs, using the state money as a punitive

    measure, misusing the incentive cards, not doing any of the reports, and mismanaging the state monies provided for the Programs;

h. Sister Maggie was violating New Mexico State Environmental Improvement Board Regulations by failing to maintain a clean and sanitary kitchen, equipment and cook ware, failing to maintain fresh, healthy food, failing to cook food appropriately and within time and temperature requirements, and failing to dispose of old and outdated food;

i. Sister Maggie contracted to install a one-way door between the Catholic Charities administrative offices and the transitional housing, in violation of 24 CFR, Part 583.300(b)(2);

j. Sister Maggie was using and allowing to be used a Catholic Charities van without state-required insurance and registration;

k. Sister Maggie was abusing female staffers and volunteers based on gender;

l. Sister Maggie failed to provide residential supervision at the transitional housing, in violation of 24 CFR, Part 583.300, leading to three children being left alone in the shelter;

m. Sister Maggie mismanaged the Drexell House so that it failed to provide adequate space, security, cooling or an acceptable place to sleep for potential residents, in violation of 24 CFR, Part 583.300.

20. From January to April 2006, Plaintiff informed a United Way representative and to the Monsignor and a priest of St. Mary's Parish in Farmington, New Mexico about Sister. Maggie endangering children by giving money to meth addicts to manufacture, distribute or buy drugs, endangering the public by giving gas money to people high on drugs, and endangering

public by giving money to meth manufacturers for hotel rooms.  Sister Kathleen Driscoll knew about the complaints.

21. From about March 2006 through October 2008, Plaintiff informed the State Health Department and to the independent Nurse Practitioner who served the clients of Catholic Charities of Farmington about Sister Maggie dispensing medication to street people without a license.  Sister Kathleen knew about the complaints.

22. In June 2007, Sister Kathleen Driscoll was visiting Catholic Charities of Farmington and called Plaintiff Scott to the home of Sister Maggie.  Sister Kathleen told Plaintiff not to talk to any priest, staff member, board member, the public or the media about any problem with the Teen Parent Program or Catholic Charities of Farmington in general, and that if he did, he would be fired.

23. In July or August 2007, Sister Kathleen Driscoll was again visiting Catholic Charities of Farmington.  During her visit, she went to a nearby gas station and bought gas for a drunk man to fill his tank and drive, in violation of public policy.  Plaintiff Scott expressed to Sister Kathleen his extreme concern at her actions.  Plaintiff Scott complained about this action to a United Way representative who related the complaints to Catholic Charities management.

24. From about August 2007 through February 2009, Plaintiff Scott informed the priests of parishes in Farmington, New Mexico about the ongoing problems with Catholic Charities of Farmington, including Sister Maggie dispensing medication without a license, Sister Maggie not allowing Mexicans to be served in the shelter, and Sister Maggie putting in a one-way door between the administrative offices and the shelter, the failure of the shelter to serve its clients, the mishandling of state money for the Teen Parent Program and the NM Dads GRADS Program, and the abuse of women staffers and volunteers.  Plaintiff Scott also informed the

7

priest about the threat to his job made by Sister Kathleen. The priests went to Sister Kathleen to attempt to rectify the problem.

25. On June 9, 2008, Plaintiff Scott reported to the accountant for Defendant Catholic Charities the problems relating to the waste, abuse and misuse of federal and state monies for the Teen Parent Program, the NM Dads GRAD Program, the incentive cards, the Drexell House, and an illegal tax write-off facilitated by Sister Maggie. The accountant reported the complaints by Plaintiff to Sister Kathleen.

26. In about June 2008, Plaintiff Scott reported the failed state of kitchen cleanliness and food spoilage to the State Health Department. The State Health Department visited the premises and found various violations of state regulations.

27. In about June 2008, Plaintiff Scott informed a Farmington priest about Catholic Charities' violations of its contracts with the State of New Mexico on the Teen Parent Program and the NM GRADS Dads Program, specifically with regard to its failure to provide life skills classes in home maintenance, meal planning and preparation, positive parenting; its failure to direct the Programs; its use of state money as a punitive measure, misuse of the incentive cards; its failure to do any of the reports; and its mismanagement of the federal and state monies provided for the Programs and the Drexell House.

28. In July 2008, Plaintiff Scott informed the Director of the NM GRADS Dads Program about Catholic Charities' violations of its contracts with the State of New Mexico. The Director immediately demanded a meeting with Sister Kathleen Driscoll.

29. In July 2008, Plaintiff Scott complained to various Advisory Board Members about the following problems with the Drexell House transitional housing:

    a. Sister Maggie was not allowing Mexicans to stay in the Drexell House, in violation of HUD's Supportive Housing Program Desk Guide and federal and state housing discrimination laws prohibiting national origin discrimination in the providing of housing services;

    b. Sister Maggie installed a one-way door between the Catholic Charities administrative offices and the transitional housing, in violation of 24 CFR, Part 583.300(b)(2);

    c. Sister Maggie failed to provide residential supervision at the transitional housing, in violation of 24 CFR, Part 583.300; and

    d. the housing did not provide adequate space, security, cooling or an acceptable place to sleep for potential residents, in violation of 24 CFR, Part 583.300.

30. Plaintiff Scott also informed Board members about Sister Maggie dispensing medication without a license.

31. In August 2008, Plaintiff Scott requested that the Farmington Fire Equipment and Safety inspect and re-certify the fire suppression system for the hood of the stove in the kitchen of the Catholic Charities of Farmington, as required by state, local and international fire codes. Sister Maggie refused to pay for the inspection and went to Sister Kathleen to complain that Plaintiff Scott wanted to contract for this service.

32. In September and October 2008, Plaintiff Scott spoke with the Chancellor and Administrative Assistant to the Bishop of Defendant Diocese of Gallup over the telephone and reported problems with the Drexell House and the Teen Parent Program. Plaintiff also spoke to the Chancellor about threats to his job and retaliatory action taken by Sister Kathleen. The Chancellor related Plaintiff's complaints to Sister Kathleen.

33. On September 8, 2008, in retaliation for the complaints enumerated above and in retaliation for the public policy concerns of Plaintiff, Sister Kathleen Driscoll determined that Plaintiff Scott would have to start paying the premiums on his health insurance for himself and his son.

34. On October 1, 2008, Sister Kathleen and Sister Mary called Plaintiff Scott to a meeting at their offices in Gallup, New Mexico. They excoriated Plaintiff for having divulged financial mismanagement to the accountant, for having divulged problems with the NM Dads GRADS Program to its Director, and for having complained about problems about the Drexell House to the Board members. Sister Kathleen again warned Plaintiff that he was not to discuss any problems having to do with Defendant Catholic Charities to any person, and if he did, he would be fired.

35. On October 10, 2008, Sister Kathleen and Sister Mary came to Farmington, New Mexico, along with a Human Resources representative. They called Plaintiff to a meeting. Also present were Sister Maggie, a board member and another staff member. In retaliation for the fair housing complaint that Plaintiff had raised concerning housing of Mexicans, and in retaliation for other public policy concerns and complaints that Plaintiff had raised, Sister Kathleen said that she was cutting Plaintiff's hours to 20 per week instead of his usual 40. Sister Kathleen again reiterated that if Plaintiff Scott were to relate any Catholic Charities problems to any person, he would be subject to termination. On information and belief, Sister Kathleen was attempting to force Plaintiff out of his job in retaliation for his complaints about the discriminatory and illegal housing practices by cutting his hours or work.

36. On October 11, 2008, Plaintiff reported to the local police that due to the lack of required supervision and other mismanagement of the Drexell House, small children were left alone at the Drexell House. Sister Kathleen learned about this police report.

37. On October 24, 2008, in retaliation for Plaintiff's public housing discrimination complaints and in retaliation for the public policy concerns and complaints that Plaintiff had raised, Sister Kathleen discontinued Plaintiff's health insurance.

38. In October and November 2008, Plaintiff continued to make his public policy complaints to board members and local priests.

39. Plaintiff took vacation and regular paid leave from the middle of November 2008 through January 5, 2009.

40. Within the first week of his return to week, Plaintiff Scott discussed his work schedule and his calendar with Sister Mary Thurlough so that she would be aware of his travel plans and USCIS appointments.

41. On February 8, 2009, Plaintiff Scott spoke to a police officer who called him about a fire alarm going off in the Drexell House. Plaintiff Scott walked in the Drexell House, saw the deplorable conditions of the House, saw the lack of residential supervision, and called Sister Kathleen to leave a message on her cell phone complaining about the violations of federal regulations.

42. On February 9, 2009, Plaintiff Scott visited with the Apostolic Administer of Defendant Diocese of Gallup and talked to him about the Drexell House. The Apostolic Administer told Plaintiff that he would take his concerns to Sister Kathleen.

43. On February 23, 2009, in retaliation for the concerns raised by Plaintiff about public housing discrimination and in retaliation for the public policy complaints of Plaintiff, Sister Kathleen fired Plaintiff Scott.

## First Claim for Relief: Fair Housing Act

44. Paragraphs 1 through 43 are incorporated herein by reference.

45. The Defendants' refusal to rent to applicants because of their national origin violated the Fair Housing Act of 1968, as amended, 42 U.S.C. §§ 3601 et seq.

46. Defendants attempts to coerce, intimidate, and threaten Plaintiff to participate or ignore acts of unlawful discrimination violated and interfered with Plaintiff in the exercise of his rights granted or protected by the Fair Housing Act, and on account of his aiding and encouraging others in the exercise of their fair housing rights in violation of 42 U.S.C. 3617

47. Defendants' modifications of Plaintiff's employment terms and conditions and his termination of employment by Defendants was on account of, and a direct and proximate result of Plaintiff's refusal to aid and assist in illegal housing discrimination and Plaintiff's aid and encouragement of others in their exercise of their fair housing rights; as such, Plaintiff's actions were protected under Federal law and Defendants' actions were retaliatory and in violation of the Fair Housing Act including § 3617 of the Act.

48. Defendants' violations of the Fair Housing Act were carried out willfully, maliciously and with reckless disregard of Plaintiff's' civil rights thereby entitling Plaintiff to punitive damages.

49. Defendants' retaliatory actions directly and proximately caused Plaintiff to suffer damages, including: economic losses resulting from the breach of his employment agreement and consequent loss of employment; damages for inconvenience resulting from having to seek

and obtain alternate employment; and damages for humiliation, embarrassment, emotional distress, and deprivation of the civil rights including the right to enjoy the benefits of the Fair Housing Act and to aid and encourage others in their exercise of their rights under the Act.

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Issue a declaratory judgment, pursuant to 28 U.S.C. §2201, declaring that the Defendants' actions complained of herein constituted discrimination and unlawful interference and retaliation with Plaintiff's rights in violation of the Fair Housing Act of 1968, as amended, 42 U.S.C. §§ 3601 et seq.;

2. Enter a judgment awarding Plaintiff appropriate punitive and compensatory damages;

3. Issue an order permanently restraining Defendants from further discriminatory conduct;

4. Award Plaintiff his costs and attorneys' fees for representation in this action pursuant to 42 U.S.C. §§ 1988 and 3613; and

5. Grant such other and further relief as the Court deems just and proper.

### Second Claim for Relief:  Public Policy Termination

50. Paragraphs 1-43 are incorporated herein by reference.

51. Plaintiff was discharged by Defendants because he performed acts as enumerated above that public policy has authorized and encouraged and because he refused to commit unlawful acts, to wit:  Plaintiff refused to violate the Fair Housing Laws and refused to discriminate in violation of the Fair Housing Laws against individuals seeking housing services.

52. Additionally, Plaintiff's discharge was a result of Defendants' actions of intimidating Plaintiff who was a person likely to become witnesses in a judicial, administrative

or other official cause or proceeding about to be brought for the purpose of preventing Plaintiff from testifying to any fact, or to abstain from testifying or to testify falsely in violation of 30-24-3(C), N.M.S.A. 1978 Comp.

53.    A causal connection exists between Plaintiff's actions and his subsequent retaliatory treatment resulting in his discharge.

54.    As a proximate result of Defendants' discharging Plaintiff in violation of the public policy of the state of New Mexico, Plaintiff has suffered and continues to suffer emotional distress, substantial losses of earnings, and other employee benefits which he would have received had Defendants not violated New Mexico public policy, all in an amount to be shown at trial.

55.    The conduct of Defendants in discharging Plaintiff constituted a violation of New Mexico public policy and was oppressive, malicious and fraudulent conduct by Defendants justifying the imposition of an award of punitive damages against Defendants in favor of Plaintiff.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays as follows:

a.   For compensatory and punitive damages in an amount to be shown at trial;

b.   That the Court award Plaintiff his costs and such further and other relief as is just in the premises.

Respectfully submitted,

*Electronically signed*
Pia Gallegos Law Firm, P.C.
116 14th St., NW
Albuquerque, NM 87102
(505) 842-8484

And

        *Electronically signed*
        Steven K. Sanders & Associates, L.L.C.
        Steven K. Sanders
        820 Second Street N.W.
        Albuquerque, NM 87102
        505-243-7170

        Attorneys for Plaintiff

Plaintiff hereby demands a jury of all issues.

*Signed Electronically*
Steven K. Sanders